NOTICE

Decision filed 08/07/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 260218-U

NO. 5-26-0218

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| *In re* HARLEY D., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, | ) | Champaign County. |
| | ) | |
| Petitioner-Appellee, | ) | |
| | ) | |
| v. | ) | No. 25-JA-82 |
| | ) | |
| Bobbie T., | ) | Honorable |
| | ) | Colleen M. Ramais, |
| Respondent-Appellant). | ) | Judge, presiding. |

_____

JUSTICE McHANEY delivered the judgment of the court.
Justices Barberis and Bollinger concurred in the judgment.

**ORDER**

¶ 1   *Held*:   The circuit court did not err in finding the minor to be neglected, in making her a ward of the court, or in finding that the respondent was unfit and unable to care for the minor. As any arguments to the contrary would lack merit, we grant respondent's appointed counsel on appeal leave to withdraw and affirm the circuit court's judgment.

¶ 2   Respondent, Bobbie T. (Mother), appeals from the Champaign County circuit court's March 12, 2026, decision finding her to be unfit and unable to parent, finding the minor Harley D. to be neglected, and making the minor a ward of the court.[1] Mother's appointed attorney on appeal concluded this appeal lacks substantial merit and filed a motion to withdraw as counsel pursuant

_____

[1]The circuit court issued the same ruling as to the minor's father, who also appealed the decision. His appeal is the subject of a separate case.

1

to *Anders v. California*, 386 U.S. 738 (1967), along with a memorandum of law in support of that motion.

¶ 3     This court provided Mother an opportunity to file a *pro se* brief, memorandum, or other responsive pleading explaining why the appointed attorney should not be allowed to withdraw as counsel, or why this appeal has merit. However, no response was filed. This court reviewed counsel's *Anders* motion, the accompanying memorandum of law, and the record on appeal, and concludes this appeal lacks merit. Accordingly, appointed counsel is granted leave to withdraw as counsel, and the judgment of the circuit court's judgment is affirmed.

¶ 4                                    I. BACKGROUND

¶ 5     On November 24, 2025, the State filed a petition for adjudication of wardship regarding the minor, who had been taken into protective custody three days prior. The State pled two counts of neglect due to an environment injurious to the minor's welfare pursuant to subsection 2-3(1)(b) of the Juvenile Court Act of 1987 (Act). 705 ILCS 405/2-3(1)(b) (West 2024). In its first count, the State alleged that Mother and the putative father (Father) (collectively, parents) exposed the minor to the use of illegal substances in the home. In the second count, the State alleged that the parents exposed the minor to substance abuse.

¶ 6     The circuit court held a shelter care hearing the same day, at which both parents stipulated to the existence of probable cause and an immediate and urgent necessity for temporary custody. The circuit court found their stipulations to be knowing and voluntary, and placed the minor in the temporary custody of the Illinois Department of Children and Family Services (DCFS).

¶ 7                                 A. Adjudicatory Hearing

¶ 8     An adjudicatory hearing was held on February 12, 2026. Both parents, through counsel, stipulated to the first count of the State's petition, and the State dismissed its second count. The

2

circuit court confirmed that the stipulations were knowing, voluntary, and made without any agreement other than the State's agreement to dismiss the second count. The court further confirmed that both parents understood the rights they were giving up, and accepted the stipulations.

¶ 9 The State then offered its factual basis. If the matter were to proceed to a hearing, the State would present evidence that on November 20, 2025, DCFS received a report alleging that the 13-year-old minor had ingested methamphetamines. The DCFS child protection investigator would also testify that in her interview with the minor, the latter admitted to smoking methamphetamines and marijuana, which she claimed she stole from her parents without their knowledge.

¶ 10 The State would also present testimony from this investigator and a police detective regarding their conversations with both parents. In these conversations, Mother and Father admitted to using methamphetamine for approximately 25 years, including as recently as a few days before the investigation. On November 21, 2025, the parents were asked to cooperate with drug testing through DCFS, but they declined, admitting to DCFS that their samples would test positive. Lastly, the State would present testimony from probation officers with knowledge of a court-ordered drug test completed by Mother on January 29, 2026, which was positive for methamphetamine.

¶ 11 The parents stipulated to the factual basis, and the circuit court accepted their stipulations after confirming that they understood the purpose of a factual basis, and that their stipulations were knowing, voluntary, and made without threat or coercion. The circuit court then accepted the State's factual basis and found that it sufficiently supported the State's allegations. The court further found that it was in the minor's best interests that the parents' stipulations and admissions be accepted. The minor was found to be neglected under the Act.

3

¶ 12                              B. Dispositional Hearing

¶ 13    The dispositional hearing took place on March 12, 2026. The minor appeared virtually at the beginning of the hearing and testified that she just "wanted to go home," and that she missed her mom and dad. The circuit court noted that it had received and reviewed a dispositional report filed by DCFS, a parent-child visitation plan, progress notes on the minor's psychiatric hospitalization, and a contact note summarizing a DCFS interview of the parents from February 11, 2026. The court also noted that it had received a calendar of the parents' drug tests.

¶ 14    DCFS's dispositional report stated that Mother had been unemployed since the minor's birth in 2012, although she reported occasional side jobs for which she was paid in cash, did not receive benefits, and was not on a payroll. DCFS had been involved with the minor previously, and Mother admitted that all of these cases involved allegations of drug use, which Mother denied had any negative impact on her ability to parent. DCFS intake documentation showed that there were an estimated six or seven prior hotline reports involving the minor. Although Mother claimed to only have traffic offenses in her criminal history, a LEADS check revealed convictions for larceny and escape. Both Mother and Father also reported significant housing instability, stating that they were living out of their vehicle at the time of the interview.

¶ 15    The report further noted that substance abuse was the greatest concern regarding Mother's ability to parent, as she had a history of methamphetamine and marijuana use that had led to DCFS involvement in the recent past. Mother admitted to having been a "functioning meth user for the last 25 years," although she described her use as recreational and did not believe it caused her any impairments. Mother reported that she last used methamphetamine four days before the January 2026 interview described in the report. DCFS noted that she displayed limited insight into how her substance abuse affected her ability to parent. Mother was scheduled for six random drug tests in

4

January, February, and early March of 2026. She failed to appear for three, one was positive for THC, another was positive for THC and methamphetamine, and one was negative.

¶ 16 The report noted that Father was unemployed, and his most recent employment ended prior to the case's opening. His unemployment benefits ended on December 1, 2025. He reported that he was actively seeking work. As previously described, the parents had been living out of their car since December 1, 2025. While DCFS's investigation into the alleged neglect was ongoing, Father and Mother moved the minor to a different county and placed her under the custody, guardianship, and decision-making authority of the minor's older brother. When both parents tested positive for amphetamines and methamphetamine, they reportedly said that they were no longer the minor's caregivers, so it did not matter. Father had a criminal history that included two convictions for assault, the latest of which occurred in 2012.

¶ 17 Like Mother, Father reported a history of marijuana and methamphetamine use. He claimed that he had last used methamphetamine 60 days before the interview, although law enforcement documentation indicated more recent usage. Father denied using methamphetamine with the minor and stated that he had completed substance use classes approximately 17 years ago relating to a DCFS case involving an older child of his. However, DCFS noted concerns based on the discrepancies between Father's self-reporting and all other evidence indicating that substance abuse remained a significant issue in his ability to parent. The latter included reports that the minor had stolen methamphetamine from her parents and was using it, and was further allegedly observed smoking methamphetamine with both of her parents.

¶ 18 The DCFS report described Father as providing minimal information during his interview and failing to articulate any specific steps the parents had taken to restrict the minor's access to unsafe adults, monitor her activities, or protect her from substance use and sexual exploitation.

5

DCFS wrote that these concerns were further compounded by the family's ongoing housing instability, the parents' unemployment, and limited engagement in services. Father was also required to complete random drug testing in January, February, and early March of 2026. There were technical issues involving his January tests, causing them to be deleted, but he failed to appear for all three of his tests after that. Both parents were also unsuccessfully discharged from parenting classes, due to a lack of attendance.

¶ 19    At the time that the case was opened, the minor was not enrolled in school or any other formal educational programming, despite reporting that she was homeschooled. Mother reported challenges with her behavioral and emotional needs. Mother stated that the minor repeatedly ran away from home and had done so since the age of six, and exhibited other significant behavioral concerns as well, including defiance, verbal disrespect, property destruction, and difficulty complying with household rules. According to Mother, she was not allowed to use social media because of repeated unsafe behaviors. Despite Mother's concern for the minor's mental health and safety, the report noted that Mother and Father had not made any efforts to secure mental health treatment for her.

¶ 20    DCFS noted additional concerns that there were reports that the minor had been sexually abused by adult men, including being coerced by her parents into having sex with their drug dealer in exchange for drugs. The minor also reported other instances where she had sexual relationships with older men in exchange for drugs. The minor had a self-reported history of substance abuse starting when she was 11 years old, as well as a history of sexual abuse, assault, and exploitation, and was at risk for sexual trafficking. The minor's current psychiatric hospitalization occurred due to her threatening self-harm in a specialized foster care home. She also had a history of self-harm

behaviors, emotional dysregulation, aggression, and suicidal ideation, and displayed symptoms of trauma-related stress.

¶ 21    At the time of case opening, the minor was reportedly frequently spending time in the home of an adult male non-relative. This was done with her parents' permission, because their home lacked running water and electricity and they were living in their vehicle. When Mother tried to retrieve the minor, the minor became aggressive and attacked her. Police were called, and the minor was taken to the hospital, where she tested positive for methamphetamine and marijuana. She was described as appearing disheveled, dirty, and very thin. The report concluded that her parents had not been making efforts to ensure that her daily care, mental health, education, or medical needs were being met for some time.

¶ 22    At the dispositional hearing, Mother testified on her own behalf that she currently had phone contact with the minor, who was hospitalized at the time. Mother had recently been able to visit her in person for the first time since mid-December 2025. Mother stated that in their conversations, the minor appeared to have "given up," had a lot of anxiety, and felt misunderstood and hurt. Mother was concerned that she heard hospital staff yelling at her daughter to get off the phone during their calls. She was further concerned that the minor, who had panic attacks and a fear of enclosed spaces, would be placed in an isolation room and have her clothes taken away "as punishment." Mother also stated that the minor received injections and pills almost every day, "for every little infraction." Mother worried that the minor's mental health was deteriorating at the hospital, and that she would have long-lasting trauma.

¶ 23    When asked whether she knew why the minor had entered psychiatric care, Mother said that she knew the minor had had thoughts of suicide, which Mother believed was because of "everything she was going through" since entering DCFS care. Mother explained that, following

the shelter care hearing, the minor was originally placed with a stranger who put her hands around the minor's throat and tried to choke her. After that, she was "just bounced around" different temporary placements for approximately week-long stays, including being made to sleep in the DCFS offices for several days.

¶ 24    Mother admitted that she should have been watching the minor closer, but she averred that she would wake up at night feeling something was wrong—and she would always later learn that she was right. It caused her distress that she could not immediately contact her daughter and make everything okay. Mother testified that she should have been paying better attention, but she did not know that the minor had been using illegal drugs, including when she tested positive a second time. Mother said she had a conversation with the minor after discovering that she was taking illegal drugs, and told her that there were legal medications she could take to help her feel better instead. However, the minor is "a teenager and they *** sneak and they do things and they have their own little minds and think they know it all." Mother admitted to using drugs in the past, but said she did not use them with her daughter.

¶ 25    Mother further testified that she and Father had had stable housing since January, and were living with their female friend of 25 years. Mother described herself as self-employed, doing housecleaning twice a week. She stated that Father was doing handyman work, and between the two of them, they were able to pay for basic necessities for themselves and the minor, and provide for her financially. Mother also said that she would enroll the minor in school, and that there was space at their friend's house for the minor to have her own room. On cross-examination, she stated that a DCFS caseworker had not yet conducted a home inspection.

¶ 26    She also described the first time that the minor tested positive for methamphetamine, in August 2025. Mother said that this was when she had a talk with the minor about why she was

8

using it—the minor said it "gave her focus." Mother said she tried to get her counseling, but did not take her to see a doctor. Mother was also asked about an incident where the minor was sexually assaulted at age 9 by a 13-year-old boy. Mother said the minor was in counseling "at one point," although Mother did not recall the name of the provider. She said that the minor discontinued therapy because she did not like the counselor. Mother also cited a lack of transportation as an obstacle to getting the minor counseling, stating that her insurance company would not provide transportation from where they were living at the time.

¶ 27    Mother next tried to have the minor enrolled in a school that could offer therapy, but the minor was "kicked out" of the school in approximately late 2024 or early 2025. Mother clarified that the minor was not allowed to return to the school due to her behaviors unless she underwent "some type of evaluation." After that, Mother stated that she and Father did not make any further attempts to get her into counseling. Instead, Mother said she just tried talking to her daughter as a parent.

¶ 28    Following Mother's testimony and hearing argument from counsel, the circuit court found it in the minor's best interest that she be made a ward of the court and adjudicated neglected. The court explained that it understood that both parents loved their daughter, and did not believe they were unwilling to be her parents. Furthermore, the court appreciated that there had been some period of time in which the parents tested negative for substances. However, the court continued, it would be in the minor's best interests for the parents to demonstrate a longer period of sobriety, particularly in light of the concerns about the minor's own drug use. The court also noted the difficulty of parenting a teenager with a history like the minor's, and the serious mental health support that she needed. The court found that, even with a more stable housing situation, Mother and Father were unfit and unable to give her what she needed at present. The court was also

9

concerned by the parents' unsuccessful discharge from parenting classes. Thus, the court placed custody and guardianship in DCFS and set a permanency goal of return home within 12 months. A written order was entered the same day.

¶ 29 Mother and Father filed timely notices of appeal.

¶ 30                                                    II. ANALYSIS

¶ 31 In the memorandum supporting its *Anders* motion, counsel states that he considered raising the following issues on appeal: (1) whether the circuit court's finding that the minor was neglected was against the manifest weight of the evidence; (2) whether the circuit court erred in making the minor a ward of the court; and (3) whether the circuit court's finding that Mother was unfit and unable to care for the minor was against the manifest weight of the evidence. Counsel has determined that these issues would be without arguable merit, and the circuit court's judgment was therefore proper.

¶ 32                                            A. Finding of Neglect

¶ 33 An adjudication of wardship under the Act involves a two-step process to determine whether a minor should be made a ward of the court. *In re A.P.*, 2012 IL 113875, ¶ 18. First, the court holds an adjudicatory hearing on the petition for adjudication of wardship, at which it considers only the question of whether the minor was abused, neglected, or dependent. *Id.* ¶ 19; 705 ILCS 405/2-18(1) (West 2024). The court determines whether the allegations in the petition are supported by a preponderance of the evidence. *In re A.P.*, 2012 IL 113875, ¶ 19. We will not reverse the circuit court's finding of neglect unless it was against the manifest weight of the evidence. *Id.* ¶ 17. A finding is against the manifest weight of the evidence only if the opposite conclusion is clearly evident. *Id.*

¶ 34     Here, both parents stipulated to the State's allegations of neglect. The State presented its factual basis, which included the proposed testimony of DCFS and law enforcement witnesses that would establish that Mother, Father, and the minor all admitted to using methamphetamine, and tested positive for the drug. Mother and Father stipulated to the factual basis as well. The record shows that the circuit court provided thorough explanations as to the meanings and effects of the parents' admissions, and engaged in extensive questioning on each occasion and with each parent to ensure that their stipulations were knowing and voluntary. There is no support for any argument that either Mother or Father could deny their admissions. See *In re M.H.*, 196 Ill. 2d 356, 366 (2001) (stating that a parent's admission of neglect or unfitness in proceedings under the Act must be knowingly and voluntarily made). We therefore agree with appointed counsel that any challenge to the circuit court's finding of neglect would lack merit.

¶ 35                              B. Wardship Determination

¶ 36     After the circuit court has determined that the minor was abused, neglected, or dependent, the matter proceeds to a dispositional hearing. *In re A.P.*, 2012 IL 113875, ¶ 21; 705 ILCS 405/2-21(2) (West 2024). At this hearing, the circuit court "determines whether it is consistent with the health, safety and best interests of the minor and the public that the minor be made a ward of the court." *In re A.P.*, 2012 IL 113875, ¶ 21; 705 ILCS 405/2-22 (West 2024). In any proceeding brought under the Act, including an adjudication of wardship, the paramount consideration is the best interest of the child. *In re A.P.*, 2012 IL 113875, ¶ 18. At this stage, the court's wardship determination " 'is based on the best interest to the child when considering the *totality of the circumstances* surrounding the child's life.' " (Emphasis in original.) *In re M.D.*, 2022 IL App (4th) 210288, ¶ 64 (quoting *In re D.S.*, 2018 IL App (3d) 170319, ¶ 15). On review, the circuit court's decision will be reversed only if its findings of fact are contrary to the manifest weight of

11

the evidence or if the court abused its discretion by selecting an inappropriate dispositional order. *In re B.S.*, 2022 IL App (2d) 220271, ¶ 32.

¶ 37    Here, the circuit court noted that while both parents had recently been able to demonstrate sobriety, it would be in the minor's best interest that they be able to show sobriety for a longer period of time. This was particularly important given the minor's own drug use. The parents had also only very recently regained stable housing and found employment. The court also commented on the minor's particular situation as a mentally ill teenager with a complex trauma background and current psychiatric hospitalization.

¶ 38    While the circuit court did not doubt Mother and Father's love for the minor, it ultimately determined that the parents were not yet in a position to be able to give her the care she needed. It is also notable that the parents had never succeeded in getting her the counseling she needed in the past, and Mother admitted that she struggled to parent a teenager with significant behavioral issues. As with its finding of neglect, we conclude that the circuit court's factual findings were not against the manifest weight of the evidence, and it did not abuse its discretion in selecting the appropriate disposition. We further find that any arguments to the contrary would be meritless.

¶ 39           C. Finding That Mother Was Unfit and Unable to Parent

¶ 40    Under the Act, the circuit court may commit a minor to DCFS wardship if it

> "determines and puts in writing the factual basis supporting the determination of whether the parents *** of a minor adjudged a ward of the court are unfit or are unable, for some reason other than financial circumstances alone, to care for, protect, train or discipline the minor or are unwilling to do so, and that the health, safety, and best interest of the minor will be jeopardized if the minor remains in the custody of the minor's parents ***." 705 ILCS 405/2-27(1) (West 2024).

Since biological parents have a superior right to custody, they must generally both be determined to be unfit, unable, or unwilling to parent before placement with DCFS is authorized. *In re Ta. A.*, 384 Ill. App. 3d 303, 307 (2008). We will not reverse the circuit court's decision unless its findings

12

were against the manifest weight of the evidence. *Id.* We may affirm the circuit court's decision on any basis present in the record. *In re K.B.*, 314 Ill. App. 3d 739, 751 (2000).

¶ 41    Appointed counsel states that he considered Mother's testimony at the dispositional hearing in exploring a possible argument. Mother acknowledged that she had at times been inadequate in watching the minor's behavior, but stated that she and Father had recently secured stable housing with a separate bedroom for the minor, and she believed they could meet the minor's financial needs. Mother denied that her use of methamphetamine impaired her ability to function. She also testified that the minor was being mistreated in the hospital, and would be happier at home. The minor herself also told the court that she wished to go home to her parents.

¶ 42    Regardless, the circuit court found both parents to be unfit and unable to parent because of their demonstrated history of substance abuse, their exposure of the minor to illegal drugs, their failure to address her experiences of sexual abuse, their failure to provide her with an education, and their unsuccessful discharge from parenting classes. The court found that both parents needed to demonstrate consistent sobriety for longer than they had previously done, and needed to successfully complete services that addressed how their substance use and mental health issues affected their ability to safely parent the minor. The court put all of its factual findings in its written order, as required by the Act. 705 ILCS 405/2-27(1) (West 2024). We determine that these findings were not against the manifest weight of the evidence, as the record shows that they were adequately supported by the evidence, particularly DCFS's dispositional report and Mother's testimony. Thus, this argument also lacks merit.

¶ 43                                 III. CONCLUSION

¶ 44    As this appeal presents no issue of arguable merit, we grant appointed counsel leave to withdraw and affirm the circuit court's judgment.

¶ 45    Motion granted; judgment affirmed.